IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DEC 2 8 2011

CLERK, U.S DISTRICT COURT
ALEXANDRIA, VIRGINIA

ADEPTECH SYSTEMS, INC.,      )
                             )
        Plaintiff,           )
                             )
    v.                       )      1:11cv383 (LMB/JFA)
                             )
FEDERAL HOME LOAN            )
MORTGAGE CORP.,              )
                             )
        Defendant.           )
                             )
                             )

<u>MEMORANDUM OPINION</u>

Before the Court is defendant's Motion for Summary Judgment
[Dkt. No. 45]. For the reasons discussed below, defendant's
motion will be granted and judgment will be entered in its
favor.

## I.  BACKGROUND

Plaintiff Adeptech Systems, Inc. ("Adeptech") has sued
defendant Federal Home Loan Mortgage Corporation ("Freddie Mac")
on claims of breach of contract, tortious interference with
contract, and civil business conspiracy under the Virginia Code
based on Freddie Mac not awarding Adeptech a contract to replace
Freddie Mac's quality control software.[1]

---

[1] The Court has jurisdiction over this action pursuant to 12
U.S.C. § 1452(f)(2), which confers original jurisdiction in the
federal district courts over all actions to which Freddie Mac is
a party.

On April 14, 2005, Adeptech entered into a Sales Agency Agreement ("Agency Agreement") with Visionet Systems, Inc. ("Visionet"), which is not a party to this lawsuit. See Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Opp'n") Ex. 1 (Sales Agency Agreement). Visionet "is the owner of the VisiLoanReview Software [VLR], including all source code and intellectual property associated with the software." Def.'s Mem. Law Supp. Mot. Summ. J. ("Def.'s Mem.") Ex. 1 ¶ 1 (Joint Stipulation of Facts). The Agency Agreement provided that Visionet, as principal, employed Adeptech as its agent to solicit orders for Visionet's products to be sold at least at the minimum price established by Visionet, and Adeptech would "be responsible for all marketing efforts including participation at trade shows, sales meetings, customer presentations, proposal preparation, related business negotiations and other activities as necessary to solicit business." Agency Agreement ¶¶ 1, 3. Pursuant to the agreement, Adeptech was entitled to "20% of the price established by [Visionet] for the Products" and any amount above this established price that was ultimately charged for a Visionet product. Id. ¶ 6.

Defendant Freddie Mac, seeking to replace its quality control software, issued a Request for Proposal ("RFP") on March 20, 2006 and Adeptech responded to the RFP on April 10, 2006. Def.'s Statement of Undisputed Facts ("SOF") ¶¶ 5-6, 10

2

(uncontested by plaintiff).  Among other provisions, the RFP
stated that Freddie Mac would "not disclose the contents of [a
bidder's] specific pricing proposal to any other entity that
submits a proposal in response to this RFP."  Def.'s Mem. Ex. 7
at 1 (RFP).  The RFP also required bidders to "identify a
contact person" along with a phone number, email address, and
fax number for future correspondence.  Id. at A1.  In the
section entitled "Award of Contract," the RFP stated:

> If any offeror's proposal includes the use of
> subcontractors, it must be clearly stated in the proposal.
> In any event, Freddie Mac will deal directly with the
> contractor, and the contractor will be responsible for the
> coordination and integration of subcontractors and for the
> quality of their work....
>
> An award will not be deemed to have been made until Freddie
> Mac and the selected contractor execute an agreement
> confirming the terms and conditions under which they will
> do business....
>
> The submission of an offer in response to this RFP does not
> create any obligation on the part of Freddie Mac
> whatsoever, including to negotiate, to enter into any
> contract or to undertake any financial obligations.

Id. at A3 (emphasis added).  After Adeptech submitted a
Confirmation of Intent to Bid form regarding the RFP, Adeptech
and Freddie Mac entered into a Confidentiality Agreement on
March 20 and 21, 2006.  Def.'s Mem. Ex. 1 ¶¶ 4-5 (Joint
Stipulation of Facts).  The Confidentiality Agreement provided
in part that Freddie Mac would not disclose Adeptech's pricing
proposal "provided that such materials are provided in written

form and prominently marked 'Confidential to ADEPTECH.'"   Id.
Ex. 8 (Confidentiality Agreement).

On April 10, 2006, Adeptech submitted two proposals in
response to the RFP based on Visionet's VLR software:  a
Functional, Technical, and Management Proposal ("FTM Proposal")
and a Price/Cost Proposal ("Pricing Proposal").  Def.'s SOF ¶ 10
(uncontested by plaintiff); Def.'s Mem. Exs. 9, 10 (FTM and
Pricing Proposals respectively).  The first page of each
proposal contained a "Proprietary Notice," stating:

> This document contains confidential information proprietary
> to Adeptech Systems, Inc. and Visionet Systems Inc. that
> shall not be disclosed outside Freddie Mac and may not be
> reproduced, copied or used for purposes other than its
> intended use without the prior written consent of the
> offerers (emphasis added).

In the FTM Proposal, Adeptech offered "a comprehensive product,
VisiLoanReview (VLR), from its partner Visionet Systems, Inc.,"
and described the Adeptech-Visionet relationship as an
"integrated partnership."  Id. Ex. 9 at 6.  The Proposal further
elaborated that "Adeptech and Visionet will work together with
Freddie Mac's External Operational Risk Management group and
other stakeholders for a comprehensive strategy...."  Id.  The
Proposal provided details about both Adeptech and Visionet in
the Partnership Background section.  Id. at 7.[2]  On June 26,

---

[2] Plaintiff maintains that the FTM Proposal used the term
"partnership" in the "generic or general sense of the word...two

4

2006, a Freddie Mac committee "recommended [Freddie Mac] 'proceed with' the Adeptech-Visionet...solution and begin negotiations."  Def.'s SOF ¶ 23 (uncontested by plaintiff).[3]

Adeptech and Visionet together gave multiple product presentations to Freddie Mac representatives in the spring and summer of 2006.  Id. ¶¶ 19, 21 (uncontested by plaintiff).  Both Rama Kant of Adeptech and Nasir Khan of Visionet delivered a Power Point presentation entitled "Adeptech Systems presents VisiLoanReview from Visionet Systems," during a May 3, 2006 meeting with Freddie Mac representatives.  See Def.'s Mem. Ex. 2 at 160:17-164:20 (Kant Dep.); id. Ex. 11 (Power Point).  All three parties were also present at a June 12, 2006 product presentation and at an August 3, 2006 meeting, at which they discussed "enhancements" to the software.  Def.'s SOF ¶ 21; Def.'s Mem. Ex. 2 at 214:6-10 (Kant Dep.).  It was also during the August 3 meeting when Frederick Craddock, Freddie Mac's independent contractor holding the title of Senior Technology Contract Analyst, asked Kant of Adeptech about the price of the VLR license.  Def.'s Mem. Ex. 2 at 214:4-22 (Kant Dep.).  Five

---

entities working on something together—as opposed to a legal or formal sense of the term."  Pl.'s Resp. to SOF ¶ 12.

[3] Despite a claim in its complaint that Frederick Craddock of Freddie Mac contacted Rama Kant of Adeptech "to inform Adeptech that it had won the contract," Compl. ¶ 17, it is undisputed that Freddie Mac never awarded the contract to Adeptech.

days later, on August 8, 2006, Kishi Kumar, Senior Vice

President of Adeptech, emailed Craddock (copying Kant and

Chauhan, the Freddie Mac project manager), attaching a letter

which stated in part:

> [A]s we had stated in our initial submission...the official 'Point Of Contact' for all contractual matters is Mr. Rama Kant.  As a result Mr. Kant is the only authorized representative to negotiate cost and other related matters during this negotiation phase.
>
> I, also request that all cost related matters are discussed with him in an appropriate forum.  Discussion of cost structure in the presence or [sic] our employees or other members of our team creates an unreasonable expectation among employees.  Since, the cost related information of our proposal is confidential and only very senior executives of our organization have knowledge of the cost structure, please limit the discussion of cost with him only.  Should it become necessary he can bring other authorized personnel into such discussion in a forum with a predetermined agenda.

Id. Ex. 18 (email and attachment).  This email is the first

evidence in the record that Adeptech put Freddie Mac on notice

of its view that Freddie Mac could not discuss pricing or any

other issue with Visionet.  At some point in mid- to late-

August, Freddie Mac Executive Vice President Smialowski

expressed his concern about working with an integrator (like

Adeptech) rather than purchasing directly from the software

vendor.[4]  See Def.'s Reply Ex. 1 at 106-108:6 (Chauhan Dep.).

---

[4] The Smialowski email itself is not in the record, and the parties characterize it quite differently.  Plaintiff argues that Smialowski's email was a "directive" that "put the Adeptech

Documentary and deposition evidence unequivocally

demonstrates that Freddie Mac developed significant concerns

about several substantive issues during the fall of 2006,

including its desire to enter into a three-party agreement with

both Adeptech and Visionet, provision of maintenance services,

calculation of maintenance fees, customization of the software,

and access to Visionet's source code, which disputes ultimately

were not resolved, as discussed further below.  See Def.'s Mem.

Ex. 5 at 111:11-112:6 (Forbes Dep.) (describing Freddie Mac's

reasons for terminating negotiations with Adeptech).  Adeptech

and Freddie Mac attended two negotiating meetings in September

2006 in an attempt to settle these issues.  The minutes from

both meetings reflect questions regarding Visionet and

Adeptech's respective roles in the project, especially how

software would be customized and maintained.  The September 6

meeting minutes include a section titled "Contract Tri-party

agreement (Freddie Mac, Adeptech/Visionet)," reflecting that

---

contract 'on ice.'"  Pl.'s Resp. to SOF ¶ 72.  Defendant
maintains that there is no evidence suggesting that the email
was a "directive" to go forward without Adeptech.  Smialowski
was available to be deposed; however, plaintiff cancelled the
deposition one day before the scheduled date.  Def.'s Reply at
7.  Although the exact nature of his concern is not in the
record, it is uncontested that Smialowski expressed some
concerns.  See, e.g., Def.'s Mem. Ex. 31 (10/9/06 email from
Freddie Mac's MacCarthy to Kant and Arshad Masood of Visionet,
stating that in the area of maintenance, Freddie Mac's executive
vice president "has suggested strongly that he would prefer a
contract with the software provider and not an integrator").

Freddie Mac proposed tri-party Software License and Maintenance Agreements.  Id. Ex. 20 at 3.  It further states that "Adeptech will execute a Services Agreement with Freddie Mac" which would govern customizations and that "Adeptech/Visionet will jointly provide the guarantee to support all customizations and upgrades."  Id.  Adeptech responded to the minutes, see id. Ex. 21, and Freddie Mac coordinated a follow-up meeting which occurred on September 25, 2006.

In setting up the second meeting, Craddock of Freddie Mac initially stated that he "strongly encourage[d]" Adeptech and Visionet representatives to attend and, in a later email, stated that such attendance was mandatory, Def.'s Mem. Exs. 22, 23; however, Visionet representatives were not copied on these invitations, and no Visionet personnel attended.  The agenda for the September 25 meeting included an "[i]n-house VisiLoanReview Product Evaluation," "Adeptech/Visionet Systems guarantees for Maintenance support, customization, upgrades and interfaces," and "Tripartite Services Agreement (Freddie Mac/Adeptech/Visionet) for joint liabilities."  Id. Ex. 23. The minutes from the September 25 meeting reflect a disagreement over maintenance fee pricing; they also continue to reflect Freddie Mac's interest in a tri-party agreement, providing the following features:

8

- o "Joint several liability by both Adeptech/Visionet for signing the license agreement
- o Procurement will draft the tri-party agreement
- o Sales agreement is not a part of the procurement process this point forward
- o The Service agreement and License agreement will govern all the terms and conditions of the contract between the vendor and Freddie Mac."

Id. Ex. 26.

Negotiations between Freddie Mac and Adeptech began to break down in early October following the September 25 meeting and Adeptech's responses to it, as evidenced by a series of emails between the parties. See Def.'s Mem. Ex. 27 (9/25/06 meeting minutes with Adeptech's comments). On October 2, 2006, MacCarthy of Freddie Mac sent an email addressed to both Kant of Adeptech and Arshad Masood of Visionet, as follows:

Dear Adeptech and Visionet,

In review of your last correspondence, I am uncomfortable with the final numbers and what I thought were some agreements from the September 25th meeting.

Specifically, I believe strongly that we ought to expect to see business logic implemented on the tool before we pay 100% of the software license fee. Release 1 does not truly implement business function, whereas Release 2 is all about the implementation of the actual business process and enabling the product for business decisions. That said, I would like to have the final 25% of the license fee held until at least the implementation of the first sub-release of Release 2. Your proposal would require 100% of the license fee by the end of Release 1 and I would like you to reevaluate that position.

Secondly, I am not comfortable at all with the maintenance fee calculation. It was my understanding that we selected your product because it could address 70% of the requirements identified in the original RFP. The Adeptech

response to charge Freddie Mac for annual maintenance on 70% of the development costs, at an amount that comes close to the same amount as proposed for the software license maintenance, is not consistent with this expectation.  We were looking for a product that may require a fair amount of "configuration" (implementation of business logic in a workflow enabling tool), but did not intend to require a lot of custom development that would require extensive maintenance-type fees.  We will pay for development to help us implement this solution, but I did not expect a high ongoing, annual charge for that development effort.  We really need you to reconsider or at minimum explain in more detail exactly what we will be getting for the non-software license portion of the maintenance calculation.  The current numbers are not supportable in my opinion.

Finally, I am concerned about an apparent change in the guarantees.  When we left on the 25th, the guarantee included the software as well as the custom development. You spoke with confidence as to the "guarantee" about the total solution.  But the current response is a guarantee only for the base software.  In effect, this guarantee covers the Visionet software, but does not provide us any guarantees for any of the customization.  Please clarify this stance.

Thanks for your assistance in clarifying these points.  We realize we are now in jeopardy of missing our 2006 goals for this project.  If possible, please let us know your position on these issues by EOD Wednesday, October 4th. Our next meeting should include representatives from Adeptech, Visionet as well as our officer-level business area stakeholders so we can complete this agreement or start down another path if we cannot come to this final agreement.

Id. Ex. 28.  MacCarthy attached the minutes from the September

25 meeting to this email.  Plaintiff contends that it was

improper for MacCarthy to discuss pricing information in an

email that was distributed to Visionet personnel.

At 3:21 pm on October 3, Kant sent MacCarthy (copying
Visionet's Masood) Adeptech's responses to the concerns
expressed by MacCarthy, and a few minutes later, at 3:28 pm,
Kant emailed MacCarthy (without copying Masood) a request that
all communications go through Kant in order to respect
Adeptech's confidentiality regarding its pricing.  Id. Exs. 29,
30.  At 4:33 pm, Masood emailed MacCarthy and Kant, requesting
that Masood be included on "all future business/contract
topics."  Id. Ex. 29.  At 6:30 pm, MacCarthy responded to Kant's
3:28 email, stating:

> Rama,
>
> I am confused and concerned about your request.  We are
> working toward a tri-party agreement where the pricing and
> terms will be well evident and agreed upon by all parties.
> Please understand that our original intent was to purchase
> a COTS software package that can be configured with our
> business processes.  This is well stated in our RFP.
> Therefore, communication with the software vendor is
> critical to the success of the whole effort.
>
> I would like correspondence from the software vendor if you
> are to be the single point of contact for this effort....

Id. Ex. 30.  The next day, Masood emailed MacCarthy and Kant to
clarify that "Kant of Adeptech is the point of contact for
contractual matters for this effort...I will be glad to assist
in addressing any questions as needed."  Id. Ex. 31.  The record
contains no further response from Adeptech or Visionet until
MacCarthy sent a follow-up email to Masood and Kant on October
9, in which MacCarthy heavily emphasized Freddie Mac's desire to

enter into a tri-party agreement and its "intent...to have

direct contacts with the software vendors."  MacCarthy went on

to explain that

> [W]e are generally more comfortable working with a software
> vendor directly for long-term maintenance.  We want
> customizations to be imbedded into the product and whomever
> signs the contracts has to be able to commit to this from a
> product standpoint.  That seems to mean that we need to
> have a distinct relationship with the software provider.

Id.[5]

Adeptech, Visionet, and Freddie Mac participated in a

conference call on October 11, for which MacCarthy drafted an

agenda with the following items:

1) Further clarification of relationship and role &
   responsibilities...

2) Who will sign the agreement(s)?

3) If there is follow on interest in Visionet products, who
   do we call?

4) If we want a direct relationship with the software
   vendor, can we initiate that?

5) There were some "costs not to exceed" or caps on the
   development proposal.  We need to clarify the "function

---

[5] Masood emailed MacCarthy (copying Kant) on October 10 in which
he clarified that "[f]rom a contract point of view—VLR being a
product is [Visionet's] protected IP and it would be handled and
supported as such."  Def.'s Mem. Ex. 32.  Kant responded to
Masood (without copying anyone from Freddie Mac) later that day
and informed him that "[t]his clearly is an interference with
our negotiating activities with the customer and a clear
violation of our written agreement and verbal (including
yesterday's) as well...Should such activities result in a loss
of business for us we have to hold you responsible for lost
opportunity...."  Id. Ex. 33.

> delivered" for specified costs more clearly to ensure we
> know what we will be getting for the costs proposed.

Def.'s Mem. Ex. 34 (10/11/06 email from MacCarthy to Kant and

Masood listing agenda).  Two days after the conference call, on

October 13, Kant sent an email to MacCarthy (copying Masood), in

which Adeptech agreed to a tri-party license agreement but

refused to enter into a tri-party services agreement, and

instead insisted on a two-party Adeptech-Freddie Mac services

agreement.  Id. Ex. 35.  Kant explained that Adeptech was "very

concerned regarding the legal aspect of Freddie Mac's ability to

switch vendor/subcontractor roles 'at will.'"  Id.

    In the wake of Adeptech's decision not to enter into a

tripartite services agreement, Visionet and Freddie Mac

exchanged three emails on which Adeptech personnel were not

included.  On October 16, Masood sent an email to MacCarthy,

which stated in part:

> Visionet will create the specs, do the integration, install
> the product, support the product and modify the product...
>
> If this takes us to be the prime contractually that is fine
> as well.  At the end of the day, all Visionet needs to do
> is to protect Adeptec's [sic] financial interest.  I have
> explained to Rama [Kant] that being a reseller his job is
> to facilitate the sale and not insist on putting the cart
> in front of the horse.  Adeptech has done good work to
> bring our product up to this point and Visionet will
> accommodate their needs as long as Freddie's project is not
> at risk....

Id. Ex. 36. According to Masood, this was the first time he had discussed a Visionet-Freddie Mac contract with Freddie Mac. Id. Ex. 3 at 170:1-4 (Masood Dep.). MacCarthy responded to Masood by email on October 17:

> Arshad,
>
> I need your help. With the disconnects evident in emails between Adeptech and Visionet, I cannot support or recommend to our business stakeholders an agreement at this point. The final straw was the lack of support for a tri-party agreement from Adeptech....
>
> How can you turn this around to a primary relationship with Visionet? We need to be open and fair from a procurement process standpoint, which may mean a re-release of the RFP with some "lessons learned" included. Can you convince Adeptech to let you be the primary on this deal? Can you propose something to us that would prevent me from going to the stakeholders and having to re-release the RFP?
>
> Let me know, or better yet, a note from you with all parties included, after an agreement with Adeptech will greatly expedite matters. You both need to be on the same page and our preferred relationship is with the software vendor, not the integrator....

Id. Ex. 36. Later on October 17, Masood informed MacCarthy that he had "talked to Adeptech in detail" and represented that "Adeptech will let us [Visionet] be the prime and work things out if that is the only remaining stumbling block." Id.

As a result of the impasse over Visionet's role in the project, Freddie Mac formally ended negotiations with Adeptech on October 19, 2006 by letter from J. Gwen Forbes, Director of Strategic Consulting, and began directly negotiating with Visionet. See Def.'s Mem. Exs. 37, 38 (10/19/06 letter to

Adeptech and 10/20/06 Masood email to MacCarthy, proposing a
Visionet-Freddie Mac contract and that Visionet would "work with
its reseller").

It is uncontested that ultimately plaintiff agreed to
change roles with Visionet, allowing Visionet to become the
prime contractor, because Adeptech "saw the handwriting on the
wall" and wanted to "try to remain in the contract in some
capacity and recover some fees after the substantial work" it
had done.  Pl.'s Resp. to SOF ¶ 82.  On November 30, 2006,
Visionet and Freddie Mac entered into a three-year Master
Services Agreement ("MSA") as well as a Software Evaluation
Agreement with a ninety-day term.  Def.'s SOF ¶¶ 90-91.  A
License and Maintenance Agreement ("LMA") with a perpetual
license duration and a minimum maintenance obligation of five
years was agreed to on July 10, 2007.  Id. ¶ 92.  Freddie Mac
terminated the MSA and LMA on January 9, 2008 due to a "security
breach" and the software's failing integration testing.  Id. ¶
93.

On June 5, 2008, Adeptech sued Visionet for unpaid
compensation due from its work on the Freddie Mac project.  See
Def.'s Mem. Ex. 45 (Visionet litigation complaint).  The case
settled on September 28, 2009, with Visionet agreeing to pay
$280,000 in exchange for Adeptech releasing all claims and

15

terminating all agreements between the two parties.  See id. Ex.
46 (Visionet settlement agreement).

In the current suit, Adeptech alleges that the
deterioration in its negotiations with Freddie Mac resulted from
defendant's desire to save costs by cutting out Adeptech as the
"middleman," and that Freddie Mac breached "certain
confidentiality and other agreements" by "disclosing pricing
information to Visionet, communicating and negotiating directly
with Visionet and ultimately signing a contract with Visionet."
Compl. ¶¶ 18, 22, 32-33; Def.'s Mem. Ex. 28 (email).  According
to plaintiff, Freddie Mac was explicitly prohibited from
contacting Visionet directly, and, instead, was required to use
Adeptech's Rama Kant as the sole point of contact ("POC").  See
Pl.'s Resp. to SOF ¶¶ 32, 35-36; Compl. ¶ 19.  Freddie Mac
counters that it "never agreed that Kant was the 'official' or
sole point of contact with respect to negotiations," but instead
believed it was free to communicate with Visionet.  Def.'s SOF
¶¶ 35-36.

In its complaint, Adeptech further alleges that Freddie Mac
tortiously interfered with its contract with Visionet and
engaged in a civil business conspiracy with Visionet "by
agreeing to disclose confidential information to, to negotiate
directly with and to contract directly with Visionet, instead of
directly with Adeptech as required by its agreements with

16

Adeptech and Adeptech's agreements with Visionet...for the purpose of willfully and maliciously injuring Adeptech's relationship with Visionet and Adeptech's trade."  Compl. ¶ 37. Plaintiff seeks actual damages of $3,735,110 plus interest, "threefold damages" in the amount of $11,205,330, punitive damages, and attorneys' fees and costs.

## II.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must view the record in the light most favorable to the nonmoving party. See Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002).  The moving party must initially show the absence of a genuine dispute of material fact, and once it has met its burden, the nonmovant "must come forward and show that a genuine dispute exists." Arrington v. ER Williams, Inc., 2011 U.S. Dist. LEXIS 14490, at *11-12 (E.D. Va. Dec. 16, 2011) (Cacheris, J.) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) and Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). However, the nonmoving party "must do

17

more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Accordingly, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252.  Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," summary judgment is appropriate.  Matsushita, 475 U.S. at 587.

### III. DISCUSSION

#### A. Breach of Contract

In Count I of the complaint, plaintiff alleges that "Adeptech and Freddie Mac had entered into certain confidentiality and other agreements relating to Freddie Mac's procurement of VLR software and other products and services" and that Freddie Mac breached these agreements by "disclosing pricing information to Visionet, communicating and negotiating directly with Visionet and ultimately signing a contract with Visionet." Compl. ¶¶ 32-33.  To establish a breach of contract claim under Virginia law, a plaintiff must prove: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of

obligation." Filak v. George, 267 Va. 612, 619 (2004).  In the
case of a written contract, "the clearest manifestation of the
parties' intent is the contract's plain language." Cent. Tel.
Co. of Va. v. Sprint Communs. Co. of Va., Inc., 759 F. Supp. 2d
789, 798 (E.D. Va. 2011) (quoting Silicon Image, Inc. v. Genesis
Microchip, Inc., 271 F. Supp. 2d 840, 850 (E.D. Va. 2003))
(alterations omitted).

     Plaintiff bases its breach of contract claim on the RFP,
the Confidentiality Agreement with Freddie Mac, and "written
correspondence, industry custom/practice and course of conduct
throughout their relationship," which "clearly and unequivocally
designated [Adeptech] as the sole and prime point of contact for
all business matters (including price) relating to the
procurement of the VLR software and attendant services." Pl.'s
Opp'n at 35.  Adeptech further alleges that Freddie Mac breached
these agreements when it improperly disclosed Adeptech pricing
information to Visionet during the August 3, 2006 meeting and in
the October 2, 2006 email, discussed below, Compl. ¶¶ 18, 22 and
Def.'s Mem. Ex. 28 (email), and that Freddie Mac also breached
its contractual obligations when it communicated directly with
Visionet after being advised that Mr. Kant of Adeptech was the
exclusive point of contact for the negotiations.  Pl.'s Opp'n at
36.

     **1. The RFP**

19

The RFP by its own terms did "not create any obligation on the part of Freddie Mac whatsoever." Def.'s Mem. Ex. 7 at A3. More specifically, nothing in the RFP imposed on Freddie Mac an obligation not to contact or disclose pricing information to Visionet. The RFP explicitly stated that no contract is established "until Freddie Mac and the selected contractor execute an agreement confirming the terms and conditions under which they will do business," id. (emphasis added), and it is undisputed that no such agreement was ever executed. See Eplus Tech., Inc. v. AMTRAK, 407 F. Supp. 2d 758, 761 (E.D. Va. 2005) (Hilton, J.) ("A request for bids is not an offer, rather the bid itself is an offer, which creates no right until it is accepted by the offeree."). Accordingly, plaintiff cannot rely on the RFP as a basis for its breach of contract claim.

Nevertheless, Adeptech points to Section A(6) of the RFP, which stated:

> If any offeror's proposal includes the use of subcontractors, it must clearly be stated in the proposal. In any event, Freddie Mac will deal directly with the contractor, and the contractor will be responsible for the coordination and integration of subcontractors and for the quality of their work.

Def.'s Mem. Ex. 7 § A(6). Plaintiff contends that this provision required Freddie Mac to deal exclusively with Adeptech during negotiations because it referred to the "offeror's proposal." Defendant responds that the RFP only required that

offerors disclose the identity of subcontractors and assume the obligation of managing those subcontractors if they are awarded the contract. Because it made the contractor responsible for the work quality of any subcontractor, this section unambiguously referred to Freddie Mac's intent that the prime contractor coordinate all work on the project once the award was issued.  A fair reading of that language is inconsistent with plaintiff's claim that under the RFP, Freddie Mac could not communicate with Visionet.

This conclusion is further supported by the language in the RFP concerning the role of the "contact person," who was described as the person "to which any future correspondence may be addressed during the RFP stage of this solicitation." Def.'s Mem. Ex. 7 at A1 (emphasis added).  Nothing in that description of the "contact person" supports plaintiff's theory that Freddie Mac could communicate only with the "contact person."  For example, although the RFP mandates that a bidder identify a contact person ("your response must identify a contact person") (emphasis added), it does not use such mandatory language in describing Freddie Mac's relationship with the contact person. Instead, the RFP merely provides that the contact person is the person to whom "any future correspondence may be addressed during the RFP stage..." (emphasis added).  The use of the permissive "may" and absence of any description such as

"exclusively" undercuts plaintiff's argument that the RFP
required Freddie Mac to contact only Kant during the negotiation
process. Lastly, Freddie Mac, as drafter of the RFP, maintains
that it "did not understand Kant's POC designation to mean that
[Freddie Mac] was required to communicate exclusively with him
[but] understood the POC label to be an 'administrative' one
that did not preclude [Freddie Mac] from contacting [Visionet]."
Def.'s Mem. at 21; id. Ex. 5 at 77:17-78:3 (Forbes Dep.).
Requesting a point of contact for a project certainly does not
necessarily imply an obligation to refrain from communicating
with other key players as necessary. For these reasons, the
language of the RFP does not support plaintiff's argument that
under the RFP Freddie Mac was prohibited from communicating
directly with Visionet.

### 2. The Confidentiality Agreement

The only other written document on which plaintiff attempts
to rely for its breach of contract claim is the Confidentiality
Agreement that delineates Freddie Mac's confidentiality
obligations during the negotiations regarding materials
submitted by Adeptech. The Confidentiality Agreement states
that Freddie Mac will not disclose Adeptech's pricing proposal
"provided that such materials are provided in written form and
prominently marked 'Confidential to ADEPTECH.'" Def.'s Mem. Ex.
8 (Confidentiality Agreement). Both the FTM and Pricing

Proposals Adeptech submitted in response to the RFP included the same Proprietary Notice:

> This document contains confidential information <u>proprietary to Adeptech Systems, Inc. and Visionet Systems Inc.</u> that shall not be disclosed outside Freddie Mac and may not be reproduced, copied or used for purposes other than its intended use without the prior written consent of the <u>offerers</u> (emphasis added).

<u>Id.</u> Exs. 9, 10.  The only reasonable interpretation of these Notices is that the information included in the FTM and Pricing Proposals is proprietary <u>to both Adeptech and Visionet</u> and not to Adeptech only.  This conclusion is consistent with the language used in the Notices, which were drafted by Adeptech. Moreover, written consent from both "offerers," that is, from both Adeptech and Visionet, before Freddie Mac could reproduce, copy or use the pricing information for other purposes, provided a completely reasonable basis for Freddie Mac's position that the Confidentiality Agreement did not prohibit it from discussing pricing with Visionet.

When the language of a document is unambiguous, the Court is limited to considering the four corners of the document itself.  <u>See</u> <u>Schneider v. Continental Casualty Co.</u>, 989 F.2d 728, 732 (4th Cir. 1993) ("If the text of the agreement is unambiguous, then the court is without authority to resort to extrinsic evidence in interpreting its meaning.").  Although one could argue that the Confidentiality Agreement does not specify

how to handle materials that are labeled as confidential to Adeptech and a second party, the only reasonable interpretation consistent with the language of the Agreement and the Proprietary Notices is that material designated as confidential to two parties may be shared with each of those parties, but not with third parties.  Adeptech, the drafter of the Proprietary Notices, certainly knew what language was necessary to comply with the facial requirements of the Confidentiality Agreement. Therefore, the Court finds that the language of the Confidentiality Agreement in conjunction with the Proprietary Notices is unambiguous, and as a matter of law Freddie Mac was not prohibited from sharing pricing information with both Visionet and Adeptech.

The FTM Proposal's description of the Adeptech-Visionet relationship as an "integrated partnership" further supports the Court's interpretation of the Confidentiality Agreement and Proprietary Notices.  Although plaintiff maintains that it was not actually in a "legal" partnership with Visionet, and that the word "partnership" was "used in the generic or general sense of the word," plaintiff chose to describe its relationship with Visionet as an integrated partnership and must live with the reasonable implications of such a label.  That description of its relationship with Visionet coupled with the language used in the Proprietary Notices fully support Freddie Mac's argument

24

that it reasonably believed it could discuss pricing information with Visionet.[6]

Furthermore, Adeptech's actions during the negotiations support Freddie Mac's view that Adeptech and Visionet were partners on the project and that Freddie Mac could communicate with either party. For example, Visionet participated with Adeptech in two product presentations given to Freddie Mac representatives, one on May 3, 2006 and a second on June 12, 2006. Def.'s SOF ¶¶ 19, 21 (uncontested by plaintiff). The Power Point presentation used at the May 3 meeting was entitled "Adeptech Systems presents VisiLoanReview from Visionet Systems" and the logos of both Adeptech and Visionet were included in the bottom corner of each page cf the presentation, again suggesting a close relationship between Adeptech and Visionet. Def.'s Mem. Ex. 11. Similarly, on October 11, 2006 in preparation for a

---

[6] In the wake of the first pricing disclosure by Craddock at the August 3, 2006 meeting, Adeptech requested that Freddie Mac discuss price only with Kant because price information was confidential. See Def.'s Mem. Ex. 18. However, that letter did not state that Freddie Mac had breached the Confidentiality Agreement; instead, Adeptech's explanation for its request was that it wished to restrict Adeptech's own employees' access to pricing information because such discussion "creates an unreasonable expectation among employees." Id. When asked about the similar notice Kant sent MacCarthy after the second disclosure in October, Forbes of Freddie Mac stated that "throughout this process Freddie Mac believed that the pricing was submitted by the parties together and confidential to both parties per the submission of the Adeptech proposal," and, consequently, that Kant's admonition was inappropriate. See id. Ex. 5 at 94:10-95:2 (Forbes Dep.).

conference call among all three parties, Kant emailed MacCarthy of Freddie Mac <u>and</u> Masood of Visionet, stating that Masood would answer "any product related technical questions" during the call whereas Kant would address "all business and contractual matters." <u>Id.</u> Ex. 34.  In the same email, on which Masood was copied, Kant discussed pricing information.  Both statements in this message contradict Adeptech's vehement argument that pricing issues were not to be discussed with Visionet.  Indeed, on both occasions in which Freddie Mac allegedly improperly disclosed pricing information to Visionet, Adeptech was present at the meeting or copied on the email, again indicating that Freddie Mac viewed the two as partners on its project.  <u>See</u> Def.'s SOF ¶ 31; Def.'s Mem. Ex. 28.

The parties' dispute over the breadth of the Confidentiality Agreement does not implicate a dispute over a material issue of fact.  Rather, it calls for an interpretation of what conduct the agreement covers, and the plain terms of the agreement support Freddie Mac's position.  Moreover, the FTM Proposal's description of Visionet as Adeptech's "integrated partner" gave Freddie Mac every reason to believe that Adeptech and Visionet were in fact partners.  Accordingly, the plain language of the Confidentiality Agreement and the Proprietary Notices requires the conclusion that Freddie Mac did not breach

26

its obligations under the Confidentiality Agreement when it discussed pricing information and communicated with Visionet.[7]

### 3. Oral Agreements

Plaintiff also claims that Freddie Mac breached an oral agreement that it would not disclose pricing information to or contact Visionet. Defendant vigorously denies that it ever entered into such an agreement.

To form a binding oral or written contract,

The parties must have a distinct intention common to both and without doubt or difference. Until all understand alike, there can be no assent, and, therefore, no contract. Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms. If any portion of the proposed terms is not settled there is no agreement.

McKay Consulting Inc. v. Rockingham Mem. Hosp., 2011 U.S. App. LEXIS 21989, at *10 (4th Cir. Oct. 28, 2011) (quoting Smith v. Farrell, 199 Va. 121 (1957)) (alterations omitted). The Court

---

[7] Plaintiff also contends that industry custom and practice prohibited Freddie Mac's contact with and disclosure of pricing information to Visionet. Pl.'s Resp. to SOF ¶ 9(B). Plaintiff cites the testimony of various Freddie Mac employees who agreed that, in general, pricing information is sensitive. See, e.g., Pl.'s Opp'n Ex. 7 at 86:1-3 (Forbes Dep.); id. Ex. 5 at 56:13-57:1 (Chauhan Dep.); id. Ex. 6 at 79, 136 (Craddock Dep.) ("Typically in the world of contracting procurement you don't have discussions about pricing other than [sic] the bidder who responded."). (Plaintiff's expert's affidavit regarding industry custom and practice was stricken from the record, see Dkt. No. 66.) Although the Court agrees that this may be a reasonable general practice, the facts of this case as discussed above do not support the conclusion that Freddie Mac was contractually bound to refrain from contacting or discussing pricing information with Visionet.

must look to the words and actions of the parties to determine whether they mutually assented to an agreement.  Id. at *11.

The evidence upon which plaintiff relies as the basis for claiming an oral contract existed is that some Freddie Mac employees testified in their depositions that they believed that Kant at Adeptech was the sole point of contact on the negotiations and that it was improper to disclose pricing information to Visionet.  Plaintiff points to two Freddie Mac employees who testified that they understood Kant to be the POC on the project.  See Pl.'s Opp'n Ex. 5 at 54:10-20 (Chauhan Dep.); id. Ex. 6 at 45:16-46, 129 (Craddock Dep.).[8]  Plaintiff also argues that Chauhan and Craddock acknowledged that disclosing price information to Visionet was inappropriate.  See Pl.'s Opp'n at 7; id. Ex. 5 at 117:1-6 (Chauhan Dep.) (stating that, because Masood of Visionet was not involved in the contract negotiations, he should not have been included on an email discussing pricing); id. Ex. 6 at 129:4-9 (Craddock Dep.)

---

[8] Plaintiff also cites to a March 2006 email from Christopher Kendig of Freddie Mac to Kant, which states in part: "Freddie Mac understands that you will be teaming with Visionet...Please keep in mind that Visionet will be considered a subcontractor to Adeptech for any project related purposes."  Pl.'s Opp'n Ex. 4. This email seems to refer to the same section of the RFP discussed supra, which requires contractors to coordinate and be responsible for the work quality of their subcontractors.

(stating that communicating with Visionet was not consistent with Adeptech's request that Kant be the sole point of contact).[9]

Despite this evidence, the record does not support an inference that Freddie Mac and Adeptech had the meeting of the minds necessary to form an enforceable agreement. At best, the evidence in the record reveals that various Freddie Mac employees had differing views about the meaning of Kant's "point of contact" designation and Freddie Mac's ability to discuss pricing or otherwise communicate with Visionet. For example, on multiple occasions, Freddie Mac requested that Visionet representatives be present at the late-September negotiating meeting. See Def.'s Mem. Exs. 22 (9/18/06 email) and 23 (9/20/06 email). In response to Kant's October 3, 2006 email asking that all communications be channeled through him, MacCarthy stated that "communication with the software vendor is critical to the success of the whole effort." Id. Ex. 30. Nearer the end of defendant's negotiations with Adeptech,

---

[9] Defendant contests plaintiff's interpretation of Craddock's testimony, arguing that the cited portion refers to whether it was proper to include Visionet on an email when Kant was the designated POC, not to whether price could be disclosed. See Def.'s Reply at 16. In contrast to plaintiff's characterization, Freddie Mac points to an earlier portion of Craddock's testimony, in which he states that he "did not have a directive" to discuss Adeptech's pricing information with Adeptech only. Pl.'s Opp'n Ex. 6 at 79:7-13. Craddock also explained that price is typically not discussed with entities other than the bidder, but that "there could also be reasons it will happen." Id. at 79:22-80:14.

MacCarthy reiterated that Freddie Mac's "intent is to have direct contacts with the software vendors" and that Freddie Mac wanted "a more direct relationship with Visionet." Id. Ex. 31 (10/9/06 email from MacCarthy to Masood and Kant).

In contrast to the testimony proffered by plaintiff, other Freddie Mac employees believed that they were not obligated to communicate with Kant alone. For example, MacCarthy stated that Freddie Mac was permitted to communicate directly with Visionet and that he "felt comfortable communicating with anybody to understand what we were buying." Def.'s Reply Ex. 3 at 64:5-16 (MacCarthy Dep.).[10] Similarly, Forbes, Director of Strategic Consulting at Freddie Mac, answered negatively when asked whether Kant was the "sole and exclusive point of contact," and responded affirmatively when asked whether "Freddie Mac was free to communicate with Mr. Masood or other officials of Visionet...[a]nd those communications could be about any or all aspects of the proposed contract by Adeptech." Def.'s Mem. Ex. 5 at 77:17-20, 78:11-20 (Forbes Dep.). Forbes testified that Freddie Mac was able to discuss pricing information with

---

[10] MacCarthy described his position at Freddie Mac as "[s]enior director, supporting IT in support of business area needs," which he characterized as "middle management." See Def.'s Mem. Ex. 6 at 11:5-16 (MacCarthy Dep.). Regarding the proposal at issue, MacCarthy testified that he "provided the team, the project management team, that helped put together the RFP with the business and then provided more of a management oversight." Id. at 12:21-24.

Visionet based on the joint price proposal.  See id. at 94:5-95:2.

Although Adeptech clearly opposed Freddie Mac's contacts with Visionet and communicated its view that all contact must be with Kant, without Freddie Mac's assent to that view of Kant's role, Adeptech's opposition did not create any kind of enforceable agreement.  See Phillips v. Mazyck, 273 Va. 630, 636 (2007) ("[M]utuality of assent—the meeting of the minds of the parties—is an essential element of all contracts.") (quoting Lacey v. Cardwell, 216 Va. 212, 223 (1975)).  As Freddie Mac persuasively argues, Adeptech's statements regarding Kant as the sole POC were at most "unilateral directives from [Adeptech] to which [Freddie Mac] never agreed," Def.'s Mem. at 22, a point that is supported by the differing views of Freddie Mac employees.  The uncontestable evidence in the record that there was disagreement even among Freddie Mac employees as to Kant's role establishes that there was no meeting of the minds between Adeptech and persons who could bind Freddie Mac as to any restrictions on Freddie Mac's communications with Visionet.  To the contrary, Forbes, the senior employee at Freddie Mac who signed the letter terminating negotiations with Adeptech and also signed the contracts with Visionet, was unequivocal in her testimony that Freddie Mac was not prohibited from communicating with Visionet.  Given this evidence, no reasonable jury could

31

find that an oral agreement existed and that Freddie Mac was in

any respect limited to communicating exclusively with Kant about

plaintiff's proposals.  Accordingly, the Court finds that the

parties did not enter into an enforceable oral agreement that in

any respect supports plaintiff's breach of contract claim.

   Because neither the RFP, Confidentiality Agreement, oral

directives, nor course of conduct establish a contractual or

otherwise enforceable agreement between plaintiff and defendant

that prohibited Freddie Mac from discussing pricing and other

details with Visionet, summary judgment on the breach of

contract claim will be granted to Freddie Mac.

B. <u>Statutory Conspiracy</u>

   Liability for a civil business conspiracy under the

Virginia Code occurs when "[a]ny two or more persons...combine,

associate, agree, mutually undertake or concert together for the

purpose of...willfully and maliciously injuring another in his

reputation, trade, business or profession by any means

whatever..."  Va. Code Ann. §§ 18.2-499 & 500.  Plaintiff must

prove by clear and convincing evidence that "(1) [defendant]

agreed or conspired with another party or parties; (2) the

conspirators acted with legal malice, that is, acted

intentionally, purposefully, and without lawful justification;

and (3) the intentional actions of the conspirators proximately

caused injury to [plaintiff]." DAG Petroleum Suppliers v. BP
Prods. N. Am., Inc., 268 F. App'x 236, 243 (4th Cir. 2008).

Plaintiff alleges that Freddie Mac engaged in such a
conspiracy with Visionet when it agreed to disclose Adeptech's
pricing information and negotiate directly with Visionet "for
the purpose of willfully and maliciously injuring Adeptech's
relationship with Visionet and Adeptech's trade, in that Freddie
Mac sought to cut Adeptech out of the transaction so that
Freddie Mac could avoid paying a higher price" for the Visionet
software. Compl. ¶ 37. Plaintiff claims that the conspiracy
began with an August 2006 email from Freddie Mac Executive Vice
President Joseph Smialowski, which plaintiff characterizes as a
"directive" that the contract was to be made with Visionet and
not through Adeptech, the reseller, causing the negotiations
with Adeptech to be put "on ice." Pl.'s Opp'n at 6. Plaintiff
alleges that after that email, Freddie Mac and Visionet engaged
in "a series of secret internal and external communications and
negotiations with the sole purpose of improperly discussing
pricing, cutting Adeptech out of the transaction and ultimately
injuring Adeptech's rights to compensation and the fruits of its
very hard work," and subsequently undertook a campaign of
pretextual emails reflecting negotiating disagreements with
Adeptech to cover up the conspiracy. Id. at 6, 33-34 (emphasis
added).

33

On the record before the Court, there is no evidence of the required malice.  Contrary to plaintiff's allegation of "secret" communications between Freddie Mac and Visionet, Adeptech now acknowledges that it was aware of the communications between Freddie Mac and Visionet.  For example, Freddie Mac included Adeptech on all of its emails with Visionet before terminating the Adeptech negotiations, except for three emails on October 16 and 17, 2006, which did not include Adeptech after Adeptech declined Freddie Mac's request for a tripartite contract. Thereafter, Visionet disclosed its negotiations with Freddie Mac to Adeptech.  See Pl.'s Resp. to SOF ¶ 82 (responding to Masood's statement to Freddie Mac that he had "talked to Adeptech in detail," Adeptech acknowledged that it "acquiesced to the change in roles"); id. ¶ 88 ("After October 19, 2006, [Adeptech] assisted [Visionet] in its negotiations with [Freddie Mac]....); Pl.'s Opp'n Ex. 9 at 327:10-12 (Kant Dep.) (acknowledging that "once in a while they [Visionet] would send us [Adeptech] documents or drafts of the documents that were being discussed between Visionet and Freddie Mac"); Def.'s Mem. Ex. 3 at 174:7-175:10 (Masood Dep.) (discussing communications with Adeptech about its compensation after Visionet began negotiating directly with Freddie Mac).

Moreover, Freddie Mac eventually awarded the contract to Visionet, only after Visionet assured defendant that Adeptech

had agreed to the Visionet-Freddie Mac negotiations and that
Visionet would pay Adeptech what it was due under the Agency
Agreement. And most importantly, Adeptech ultimately acquiesced
to the Visionet-Freddie Mac contract.

Although malice "does not require proof that the
conspirators' primary and overriding purpose is to injure
another," Feddeman & Co. v. Langan Assocs., P.C., 260 Va. 35, 45
(2000) (quoting Advanced Marine Enters. v. PRC, Inc., 256 Va.
106, 117 (1998)) (internal quotation marks omitted), a party's
intent to make a profit does not on its own constitute malice.
See DAG Petroleum Suppliers L.L.C. v. BP P.L.C., 452 F. Supp. 2d
641, 650 (E.D. Va. 2006) (Cacheris, J.), aff'd, DAG Petroleum
Suppliers v. BP P.L.C., 268 F. App'x 236 (4th Cir. 2008)
(holding that intent to make a profit, "in a capitalistic
society, can hardly be considered a malicious intent to injure
any member with whom it competed").

Defendant maintains that it ended negotiations with
Adeptech because its "proposals were inadequate and no agreement
was reached on key issues," and that the termination was not due
to any intent to injure Adeptech. Def.'s Mem. at 25, 29. The
record illustrates these points of disagreement on the part of
Freddie Mac, eroding any claim of Freddie Mac's evil intent.
See, e.g., Def.'s SOF ¶¶ 52-82; Def.'s Mem. Ex. 5 at 68:9-16
(Forbes Dep.) ("What Freddie Mac was very concerned about was

protecting our interests because of the fact that Adeptech did
not have access to source code and, therefore, they would be
unable to provide maintenance and they would be unable to
provide customizations to the core system. And, therefore, we –
we decided that we really needed to have a try-party [sic]
agreement in order to ensure that our interests would be
protected"); id. Ex. 28 (10/2/06 MacCarthy email indicating that
he was "uncomfortable with the final numbers" and articulating
specific concerns regarding maintenance and licensing fees and
guarantees); id. Ex. 31 (10/9/06 MacCarthy email emphasizing
Freddie Mac's desire for a tri-party agreement and again
explaining issues with the maintenance fees). In his October 17
email to Masood, MacCarthy unequivocally stated that he could
not "support or recommend" the Adeptech contract, and that
"[t]he final straw was the lack of support for a tri-party
agreement from Adeptech." Id. Ex. 36 (10/17/06 email from
MacCarthy). In sum, the record reflects that Freddie Mac was
genuinely dissatisfied with Adeptech's offerings and that the
negotiations between the two were breaking down for legitimate
business reasons.

Although "[t]he parties' failure to come to an agreement is
not clear and convincing evidence" of a conspiracy, HCP Laguna
Creek CA, LP v. Sunrise Senior Living Mgmt., 737 F. Supp. 2d
533, 553 (E.D. Va. 2010) (Lee, J.) and "[a]n inability to agree

does not always flow from evil animus," <u>Meadow Ltd. P'Ship v. Heritage Sav. & Loan Ass'n.</u>, 639 F. Supp. 643, 653 (E.D. Va. 1986), Adeptech maintains that Freddie Mac manufactured such disagreements as a pretext for its true, improper reasons for terminating the negotiations with Adeptech.  In particular, Adeptech contends that Freddie Mac "began a campaign of sending pretextual emails in an attempt to muddy the waters of what was a clear agreement to negotiate only with Adeptech as the prime contractor."  Pl.'s Opp'n at 36; <u>see also</u> Pl.'s Resp. to SOF ¶ 59 (arguing that "confusion" expressed in MacCarthy's October 2 email was pretextual).  As defendant correctly argues, however, there is no evidence that Freddie Mac invented false negotiating disagreements or sent emails as a pretext to cover up a conspiracy.  <u>See</u> Def.'s Reply at 11.  This is merely plaintiff's unsupported theory, which does not create a dispute of material fact adequate to defeat a motion for summary judgment.  <u>See DAG Petroleum Suppliers L.L.C.</u>, 452 F. Supp. 2d at 648 ("Unsupported speculation is not enough to withstand a motion for summary judgment.").  The evidence shows that the "final straw" causing the failure of the Adeptech bid was Adeptechs's resistance to a three-party agreement, an issue dating back to early September. <u>See, e.g.</u>, Def.'s Mem. Ex. 5 at 99:14-100:22 (Forbes Dep.) (explaining that it was Freddie Mac's objective at both September meetings that all of the agreements be tri-party).

Of most significance in analyzing plaintiff's conspiracy claim is the uncontested evidence that, rather than trying to cut Adeptech out of the negotiations, Freddie Mac wanted a tri-party agreement that would include both Visionet and Adeptech. Even assuming the accuracy of plaintiff's assertion that "Freddie Mac and Visionet had commenced secret communications and negotiations at least since August 2006," Pl.'s Resp. to SOF ¶ 80, the record clearly shows that Freddie Mac never intended to cut Adeptech out of the deal.  To the contrary, the evidence is uncontested that defendant insisted that Adeptech and Visionet "be on the same page," and it was not until Masood indicated that he had "talked to Adeptech in detail" and that "Adeptech will let us be the prime and work things out if that is the only remaining stumbling block" that the contract was awarded.  Def.'s SOF ¶ 82; Def.'s Mem. Ex. 36 (emails). Visionet gave Freddie Mac every assurance that it would in fact pay Adeptech what it was due for working on the contract.  See Def.'s Mem. Ex. 36 (10/17/06 email from MacCarthy to Masood); id. (10/17/06 email from Masood to MacCarthy); id. Ex. 3 at 170:24-171:13, 172:22-173:9, 175:4-10 (Masood Dep.).

Adeptech does not dispute that it was in fact informed of Visionet's communications with Freddie Mac, and concedes that it "acquiesced to the change in roles" to remain involved in the project.  Pl.'s Resp. to SOF ¶ 82; see also Pl.'s Opp'n Ex. 9 at

Case 1:11-cv-00383-LMB-JFA  Document 70  Filed 12/28/11  Page 39 of 42 PageID# 2642

327:10-12 (Kant Dep.) (acknowledging that "once in a while they [Visionet] would send us [Adeptech] documents or drafts of the documents that were being discussed between Visionet and Freddie Mac"). In its sur-reply, plaintiff states that, after realizing that it would not be awarded the contract, it "agree[d] to have Visionet commence negotiations with [Freddie Mac], upon the condition that Adeptech would recover all of its fees due and owing under the Sales Agency Agreement." Pl.'s Sur-Reply at 10. Thereafter, Adeptech and Visionet undertook their own discussions regarding commissions due to Adeptech, in which Visionet stated that it would in fact pay Adeptech. See Def.'s Mem. Ex. 2 at 229:6-330 (Kant Dep.). Plaintiff's agreement to the contract between Freddie Mac and Visionet appears to have been dependent only on Adeptech's receiving the commissions it was due under the Agency Agreement—and not on receiving the additional fees it currently seeks from Freddie Mac.[11]

    Lastly, at oral argument, counsel for Freddie Mac represented that, had Adeptech not acquiesced to the Freddie Mac-Visionet arrangement, Freddie Mac would not have awarded the contract under the RFP. By consenting to the Visionet-Freddie

---

[11] In Adeptech's complaint in the Visionet lawsuit, Adeptech characterizes its role as having "obtain[ed] the sale of VLR and related products and services" to Freddie Mac and, as a result, it was due "20% of the baseline price of that transaction and any related products and services and 100% of any amount above that baseline price" from Visionet. Def.'s Mem. Ex. 45 ¶ 11 (Visionet litigation complaint).

Mac arrangement, Adeptech ultimately received $280,000 due from

Visionet pursuant to the Agency Agreement; had Freddie Mac

declined to award a contract to Visionet, Adeptech would have

received nothing for its efforts.

Plaintiff contends that the Court would be improperly

weighing the evidence were it to accept Freddie Mac's argument

that it ended negotiations with Adeptech for substantive rather

than pretextual reasons.  See Pl.'s Opp'n at 34.  The Court need

not credit allegations unsupported by the evidence, however, and

plaintiff has not offered any proof that the concerns Freddie

Mac expressed about Adeptech's proposal were pretextual.

Instead, it merely alleges in a conclusory fashion that such

evidence is fake, with no evidence supporting this contention.

For these reasons, plaintiff has failed to offer clear and

convincing evidence that Freddie Mac and Visionet maliciously

entered into a conspiracy, proximately causing injury to

Adeptech.  Therefore, defendant will be awarded summary judgment

on the statutory conspiracy claim.

## C. Tortious Interference with Contract

Plaintiff also alleges that Freddie Mac tortiously

interfered with the Agency Agreement between Adeptech and

Visionet.  Defendant has moved for summary judgment on this

claim, arguing that under Virginia case law plaintiff cannot

prevail because there is no competitive relationship between

Freddie Mac and Adeptech. In its opposition, plaintiff does not dispute that a competitive relationship is an element of this claim.

To make out a prima facie case of tortious interference with contract, a plaintiff must show:

> (i) the existence of a valid contractual relationship or business expectancy; (ii) knowledge of the relationship or expectancy on the part of the interferor; (iii) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (iv) resultant damage to the party whose relationship or expectancy has been disrupted.

DurretteBradshaw, P.C. v. MRC Consulting, L.C., 277 Va. 140, 145 (2009) (citing Chaves v. Johnson, 230 Va. 112, 120 (1985)). Furthermore, "Virginia caselaw applying the tort of intentional interference with a business expectancy contain a fifth, unstated element to the prima facie case: a competitive relationship between the party interfered with and the interferor." 17th St. Assocs., LLP v. Markel Int'l Ins. Co., 373 F. Supp. 2d 584, 600 (E.D. Va. 2005) (listing cases).

In its sur-reply, plaintiff "acknowledges that [Freddie Mac] is not a competitor, thus precluding the tortious interference action" and does not dispute that the competitor element is required. Pl.'s Sur-Reply at 10. Because plaintiff concedes that it cannot make out a prima facie case of tortious interference with contract, summary judgment for defendant will be granted on this count.

41

## IV.   CONCLUSION

Based on the evidence in the record, there is no genuine dispute of material fact sufficient to defeat defendant's summary judgment motion, because plaintiff has produced no hard facts to support its theory of the case.  Even viewing the evidence in the light most favorable to the nonmoving party, plaintiff has failed to demonstrate anything more than mere speculation and theories unsupported by facts in the record. For all the reasons stated above, defendant's Motion for Summary Judgment will be granted by an Order to accompany this Memorandum Opinion.

Entered this _28th_ day of December, 2011.


Alexandria, Virginia


                                        /s/
                                    _____
                                    Leonie M. Brinkema
                                    United States District Judge

42